**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

|  |  |  |
| --- | --- | --- |
| MICHELLE KRETSINGER and KEITH KRETSINGER, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | **CIVIL ACTION NO.**:   3:10-cv-50132 |
| AMCORE FINANCIAL, INC., KENNETH E. EDGE, WILLIAM R. MCMANAMAN, PAULA A. BAUER, PAUL DONOVAN, TERESA IGLESIAS-SOLOMON, JOHN A. HALBROOK, FREDERICK D. HAY, STEPHEN S. ROGERS, JOHN W. GLEESON, JACK D. WARD, LORI M. BURKE, JUDITH CARRÉ SUTFIN, DONALD H. WILSON and DOES 1-10, | ) ) ) ) ) ) ) ) ) ) ) ) ) | **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) ) | |

Plaintiffs ("Plaintiffs") participants in the Amcore Financial Security Plan (the "Plan") during the proposed Class Period (defined below), allege as follows on behalf of the Plan, themselves and a class of all others similarly situated:

## INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries.

2.      Plaintiffs were participants in the Plan during the Class Period, during which time the Plan held interests in the common stock of Amcore Financial, Inc. ("Amcore" or the

"Company").  Plaintiffs' retirement investment portfolios in the Plan during the Class Period included Amcore stock.

3.      401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals.  An employee participating in a 401(k) plan may have the option of purchasing the common stock of his or her employer, often the sponsor of the plan, for part of his or her retirement investment portfolio.  Common stock of Amcore was one of the investment alternatives of the Plan throughout the Class Period.

4.      Plaintiffs allege that Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties owed to them and to the other participants and beneficiaries of the Plan in violation of ERISA §§ 404(a) and 405, 29 U.S.C. §§ 1104(a) and 1105, particularly with regard to the Plan's holdings of Amcore stock.

5.      Specifically, Plaintiffs allege in Count I that certain Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to them, the Plan and proposed Class by failing to prudently and loyally manage the Plan's investment in Company securities by (1) continuing to offer Amcore common stock as a Plan investment option when it was imprudent to do so; (2) failing to provide complete and accurate information to participants in the Plan regarding the Company's financial condition and the prudence of investing in Company stock; and (3) maintaining the Plan's pre-existing heavy investment in Amcore equity when Company stock was no longer a prudent investment for the Plan.  These actions/inactions run directly counter to the express purpose of ERISA pension plans, which are designed to help provide funds for participants' retirement.  *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

6.      Plaintiffs' Count II alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan's and their participants' best interests in mind.

7.      Plaintiffs' Count III alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering Amcore stock as an investment option and investing Plan assets in Amcore stock when it was no longer prudent to do so.

8.      Plaintiffs allege that Defendants allowed the heavy imprudent investment of the Plan's assets in Amcore equity throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent due to, as explained below in detail and among other things: (a) Amcore Bank, N.A. ("Amcore Bank"), the Company's principal subsidiary, was blindly sacrificing conservative lending practices in favor of rapid expansion; (b) Amcore Bank was failing to take adequate steps to ensure that it remained adequately capitalized; (c) Amcore Bank was engaging in unsound and unsafe banking practices, including poor credit underwriting and administration practices in its commercial lending division; (d) Amcore Bank's poor underwriting practices and failure to retain adequate capital left it exposed to enormous losses from construction and development loans in its portfolio; (e) as a consequence of the above, the Company's stock price would suffer as the truth became known; and (f) heavy investment of employees' retirement savings in Company stock would inevitably result in significant losses to the Plan and, consequently, to its participants.

9.      This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are liable pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132.  Because Plaintiffs' claims apply to the Plan, inclusive of all participants with accounts invested in Company stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiffs to sue for relief to the Plan for breaches of fiduciary duty such as those alleged herein, Plaintiffs bring this as a class action on behalf of the Plan and all participants and beneficiaries of the Plan during the proposed Class Period.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.      Venue is proper in this district pursuant to ERISA section 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and Amcore has its principal place of business in this district.

## PARTIES

**Plaintiffs**

12.      Plaintiffs Michelle Kretsinger and Keith Kretsinger are "participants" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Amcore shares in their retirement investment portfolios during the Class Period.

**Defendants**

The Company

13.      As further described below, Defendant Amcore, the Plan sponsor and administrator, was a fiduciary of the Plan and exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's

4

assets.  The Company acted through the Board of Directors (the "Board") and the Board's Compensation Committee (the "Compensation Committee"), as well as the Company's Chief Executive Officer ("CEO") and other Company officers/employees appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.

Director Defendants

14.     Defendant Kenneth E. Edge ("Edge") served as Chairman of the Board until May 2008.  Defendant Edge served as the Company's CEO from July 2002 until February 2008 and as President of the Company from January 2003 through August 2007.  Additionally, Defendant Edge served as Chairman of the Board and CEO of Amcore Bank until February 2008.

15.     Defendant William R. McManaman ("McManaman") served as a member of the Board during the Class Period and as Chairman of the Board beginning in May 2008.  Further, beginning in February 2008, Defendant McManaman served as the Company's CEO and Chairman of the Board and CEO of Amcore Bank.

16.     Defendant Paula A. Bauer ("Bauer") served as a member of the Board during the Class Period.

17.     Defendant Paul Donovan ("Donovan") served as a member of the Board during the Class Period.  Further, Defendant Donovan served as a member of the Compensation Committee during the Class Period.

18.     Defendant Teresa Iglesias-Solomon ("Iglesias-Solomon") served as a member of the Board during the Class Period.

19.     Defendant John A. Halbrook ("Halbrook") served as a member of the Board during the Class Period.

20.     Defendant Frederick D. Hay ("Hay") served as a member of the Board during the Class Period.  Further, Defendant Hay served as a member of the Compensation Committee during the Class Period.

21.     Defendant Stephen S. Rogers ("Rogers") served as a member of the Board during the Class Period.

22.     Defendant John W. Gleeson ("Gleeson") served as a member of the Board during the Class Period.

23.     Defendant Jack D. Ward ("Ward") served as a member of the Board during the Class Period.  Further, Defendant Ward served as Chairperson of the Compensation Committee during the Class Period.

<u>Officer/Employee Defendants</u>

24.     As further described below, certain Company officers and other employees were delegated certain of the Company's responsibilities as the Plan Administrator during the Class Period.

25.     Defendant Lori M. Burke ("Burke") served as Executive Vice President and Chief Human Resources Officer from October 2006 to October 2007 and as Executive Vice President, Administrative Services of Amcore Bank since October 2007.  On May 13, 2008, Defendant Burke was promoted to Executive Vice President, Administrative Services of Amcore.  Her duties included responsibility for employment and employee relations, compensation and benefits, corporate communications and investor relations.  Defendant Burke signed the Company's 2007 and 2008 Form 5500 submissions to the IRS and Department of Labor on behalf of the Company as Plan Administrator.

26.     Defendant Judith Carré Sutfin ("Sutfin") served as the Company's Executive Vice President and Chief Financial Officer ("CFO") beginning in December 2007 and as a director of

Amcore Bank beginning in January 2008.   On June 30, 2008 and June 29, 2009, Defendant

Sutfin signed the Company's 2007 and 2008 Form 11-K submissions to the SEC on behalf of the

Company as Plan Administrator.

27.     Defendant Donald H. Wilson ("Wilson") served as the Company's Chief

Operating Officer beginning in August 2007 and as Executive Vice President and CFO from

February 2006 to August 2007.   On July 13, 2007, Defendant Wilson signed the Company's

2006 Form 11-K submission to the SEC on behalf of the Plan, as well as an amendment thereto

on July 16, 2007, on behalf of the Company as Plan Administrator.

28.     To the extent that there are additional Company officers, directors and employees

who were fiduciaries of the Plan during the Class Period, including members of the Plan

Committee, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the

right, once their identities are ascertained, to seek leave to join them to the instant action.

## THE PLAN

29.     The Plan is an employee benefit plan within the meaning of ERISA §§ 3(3) and

3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A), and it is an "employee pension benefit plan"

within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).   Further, it is an "eligible

individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and

a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C.

§ 401(k).

30.     The Plan is a "defined contribution" or "individual account" plan within the

meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual

accounts for each participant and for benefits based solely upon the amount contributed to those

accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of other

participants which may be allocated to such participant's account.   Consequently, retirement

benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

31.     The Company is the administrator of the Plan.[1]

32.     Effective beginning February 1, 2008, the Plan was amended to allow for automatic enrollment.  Prior to February 1, 2008, employees were eligible to participate in the Plan following the completion of ninety days of service.

33.     Each year, participants may contribute up to 100% of their annual wages on a pretax basis, not to exceed $15,500 in 2008 and $15,500 in 2007.

34.     If the participant was age 50 or older, the participant was entitled to contribute an additional "catch-up contribution" of up to $5,000 per year in 2008 and 2007.

35.     Amcore makes safe harbor matching contributions of 100% of the first 3% of employee compensation contributed to the Plan and 50% of the next 2% of compensation contributed to the Plan.

36.     Employer matching contributions are invested in Amcore common stock; however, participants are allowed to sell any portion of their Amcore common stock within the Plan and direct the proceeds to another investment choice within the Plan.

37.     Prior to April 1, 2009, Amcore also made a contribution equal to 3% of the participants' annual wages each year to a basic retirement account.  These funds are allocated to investments in the same manner as the participants' contributions. The Company suspended the basic retirement contribution effective April 1, 2009.

38.     Participants are immediately vested in both their contributions and that of the employer.

---

[1]     The information is derived from the 2009 Form 11-K.

39.     Individual accounts are maintained for each of the Plan's participants. Each participant's account is credited with the participant's contributions, the participant's share of Company contributions, and allocations of the Plan's income and loss.

40.     The benefit to which a participant is entitled is the benefit that can be provided from the participant's vested account.

41.     Participants may direct their account balance and contributions and any related earnings thereon into nineteen investment options.  Participants have the ability to invest up to 10% of new employee deferral contributions into AMCORE Common Stock.

42.     As of December 31, 2006, when the Company's stock was trading at $32.67 per share, the Plan held 768,736 shares of Company stock, valued at approximately $25 million.  As of December 31, 2007, when the Company's stock was trading at $22.70 per share, the Plan held 709,811 shares of company stock, valued at approximately $16 million.  As of December 31, 2008, when the Company's stock was trading at $3.62 per share, the Plan held 877,676 shares of Company stock, valued at approximately $3 million.[2]  On April 23, 2010, trading of Amcore stock was halted at $0.79 per share.

## CLASS ACTION ALLEGATIONS

43.     Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plan, themselves and the following class of persons similarly situated (the "Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between May 3, 2007 and the present (the "Class Period") and whose Plan accounts included investments in Amcore common stock.

---

[2]     Notably, during 2008, the number of shares of Company stock in the Plan increased from 709,811 to 877,676.

44.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are several thousand members[3] of the Class who participated in, or were beneficiaries of, the Plan during the Class Period and whose Plan accounts included investment in Amcore stock.

45.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

      (a)     whether Defendants each owed a fiduciary duty to the Plan, Plaintiffs and members of the Class;

      (b)     whether Defendants breached their fiduciary duties to the Plan, Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

      (c)     whether Defendants violated ERISA; and

      (d)     whether the Plan and members of the Class have sustained damages and, if so, what is the proper measure of damages.

46.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs, the Plan and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

47.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Plan or the Class.

---

[3]     According to the 2008 Form 5500, as of December 31, 2008, the Plan had over 1,900 participants.

48.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

49.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS

50.     During the Class Period, upon information and belief, each Defendant was a fiduciary of the Plan, either as a named fiduciary or as a *de facto* fiduciary with discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

51.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

52.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan,

or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

53.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plan because:

(a)     they were so named; and/or

(b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)     they exercised discretionary authority or discretionary control respecting management the Plan; and/or

(d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

54.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

55.     Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

56.    Instead of delegating all fiduciary responsibility for the Plan to external service providers, the Company chose to assign the appointment and removal of fiduciaries to itself.

57.    ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

58.    During the Class Period, all of Defendants acted as fiduciaries of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

**The Company's Fiduciary Status**

59.    Amcore was a fiduciary of the Plan.   The Company served as the Plan Administrator.  *See* 2009 Form 11-K.  Further, the Company was likely a named fiduciary of the Plan.

60.    As Plan Administrator, the Company exercised discretionary authority with respect to management and administration of the Plan and/or exercised authority or control over the management and disposition of the Plan's assets.

61.    Instead of delegating fiduciary responsibility for the Plan to external service providers, the Company chose to internalize certain vital aspects of this fiduciary function.

62.    The Company acted through the Board and the Compensation Committee, as well as through certain designated officers and employees.  The Company had, at all applicable times, effective control over the activities of its officers and employees, appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment, including over their Plan-related activities.

13

63.     By failing to properly discharge their fiduciary duties under ERISA, the employee and officer defendants breached fiduciary duties they owed to the Plan, their participants and their beneficiaries.  Such individuals were appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.  Accordingly, the actions of such employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

**Director Defendants' Fiduciary Status**

64.     The Board had primary oversight of the Plan.

65.     The Board collectively retained responsibility for the actions of the Compensation Committee.

66.     The Compensation Committee is appointed by the Board.  The duties of the Compensation Committee expressly include an obligation to oversee the Company's compensation and employee benefit plans and practices.  *See* Amcore Definitive Proxy Statement, filed with the SEC on March 22, 2010, at 3.

67.     Upon information and belief, the Compensation Committee bore ultimate responsibility for appointing and monitoring Company officers/employees' delegated duties with respect to the administration/management of the Plan and management of the Plan's assets, appointing and monitoring investment managers, directing the Plan's investments and periodically reviewing and approving or making recommendations to the Board with respect to the adoption of material changes to the Plan.

68.     Each member of the Compensation Committee was a member of the Board and therefore also had fiduciary responsibility to the Plan and their participants in that regard.

69.     The Director Defendants were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority with

14

respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

**Officer/Employee Defendants' Fiduciary Status**

70.     Certain non-director Company officers and other employees were delegated certain of the Company's responsibilities as the Plan Administrator during the Class Period. Upon information and belief, without limitation, these included Defendants Burke, Sutfin and Wilson.

71.     These and other non-director Company officers/employees were delegated the day-to-day responsibility for the administration of the Plan and the management of the Plan's assets.

72.     The Officer/Employee Defendants were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

73.     ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the Plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

74.     Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan participants will not be injured.

75.     During the Class Period, upon information and belief, the Company and certain other Defendants made direct and indirect communications with the Plan's participants including

statements regarding investments in Company stock.  These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions ("SPDs") and/or prospectuses regarding Plan/participant holdings of Company stock), which included and/or reiterated these statements.  Upon information and belief, at all times during the Class Period, the Company's SEC filings were incorporated into and part of the SPDs, and/or a prospectus and/or any applicable SEC Form S-8 registration statements.  Defendants also acted as fiduciaries to the extent of this activity.

76.    Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press,[4] concerning investment in company stock, including that:

(a)    Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

(b)    Out of loyalty, employees tend to invest in company stock;

(c)    Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(d)    Employees tend not to change their investment option allocations in the plan once made;

---

[4]    Joanne Sammer, *Managed Accounts: A new direction for 401(k) plans*, Journal of Accountancy, Vol. 204, No. 2 (August 2007) (available at: http://www.aicpa.org/pubs/jofa/aug2007/sammer.htm); Roland Jones, *How Americans Mess Up Their 401(k)s*, MSNBC.com (June 20, 2006) (available at: http://www.msnbc.msn.com/id/12976549/); Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001) (available at: http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plans - the importance of plans design*, Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at: http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

(e)     No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(f)     Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(g)     Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with its rewards.

77.     Even though Defendants knew or should have known these facts, and even though Defendants knew of the substantial investment of the Plan's funds in Company stock, they still took no action to protect the Plan's assets from their imprudent investment in Company stock.

## SUBSTANTIVE ALLEGATIONS

78.     Throughout the Class Period, Amcore described itself as a registered bank holding company, the operations of which were divided into four business segments: Commercial Banking, Retail Banking, Investment Management and Trust and Mortgage Banking.  Amcore owned directly or indirectly all of the outstanding common stock of each of its subsidiaries and provided its subsidiaries with advice and counsel on policies and operating matters among other things.

79.     Throughout the Class Period, Defendants knew or should have known that Amcore stock was an imprudent Plan investment, because: (a) Amcore Bank, the Company's principal subsidiary, was blindly sacrificing conservative lending practices in favor of rapid expansion; (b) Amcore Bank was failing to take adequate steps to ensure that it remained adequately capitalized; (c) Amcore Bank was engaging in unsound and unsafe banking practices, including poor credit underwriting and administration practices in its commercial lending

17

division; (d) Amcore Bank's poor underwriting practices and failure to retain adequate capital left it exposed to enormous losses from construction and development loans in its portfolio; (e) as a consequence of the above, the Company's stock price would suffer as the truth became known; and (f) heavy investment of employees' retirement savings in Company stock would inevitably result in significant losses to the Plan and, consequently, to its participants.

80.    Defendants could not have acted prudently when they continued to permit Plan investment in Company stock and maintained the Plan's investments in Company stock.

81.    As a consequence of the below-described facts, Defendants knew or should have known that Company stock was an imprudent investment for the Plan.  Their fiduciary duties notwithstanding, Defendants failed to protect the Plan participants' retirement savings from being imprudently invested in Company stock, and as a result, the Plan suffered losses.  A prudent fiduciary facing similar circumstances would not have stood idly by as the Plan lost millions of dollars.

A.    **AMCORE SACRIFICED CONSERVATIVE FINANCING PRACTICES IN FAVOR OF RAPID EXPANSION**

82.    Amcore Bank was Amcore's principal subsidiary.

83.    Amcore, which was built on a series of mergers, rapidly expanded to include 66 locations in Illinois and Wisconsin, including 27 net new offices added in Rockford, IL, Madison, WI, and suburban Chicago and Milwaukee, since its branch expansion program began in April 2001.

84.    The Company grew to have banking assets of over $5 billion.

85.    This created a tremendous problem, as the Company emphasized growth over quality lending practices.  Indeed, analysts later opined that Amcore "expanded too aggressively by opening new offices in Chicago's suburbs, amassing a network of 74 branches built on risky

lending and offering high-interest rate deposits." *See* Lee Murphy, *CEO Says Failure Concerns Valid*, Crain's Chicago Business (May 5, 2009), available at: http://www.chicagobusiness.com/cgi-bin/news.pl?id=33944.

86.    The Company's loan portfolio was heavily concentrated in commercial real estate—specifically in construction and land development loans and non-residential commercial real estate loans.    Construction and land development loans represented approximately 24 percent of total commercial loans outstanding and 19 percent of total loans.

87.    On July 2, 2007, Fitch Ratings downgraded the ratings of Amcore and Amcore Bank, citing the lack of improvement in Amcore's core earnings performance through 2006 and the first quarter of 2007.

88.    On July 18, 2007, Amcore reported its financial results for the second quarter of 2007.    Amcore stated that its non-performing loans increased $8.7 million from June 30, 2006, and increased $675,000 from March 31, 2007.    Its provision for loan losses was $4.2 million and net charge-offs were 0.48 percent of average loans on an annualized basis compared to $2.3 million and 0.25 percent in second quarter 2006 and $3.2 million and 0.28 percent in first quarter 2007, respectively.

89.    However, the Company stated that its earnings per share had improved over the prior quarter due to lower expenses, an increase in net revenues and increased loan growth.    The Company reported that its average loan balances grew five percent, or $186 million, compared to second quarter of 2006.    Defendant Edge stated, "Our markets remain strong and our core performance is improving."

90.    On October 18, 2007, Amcore reported its financial results for the third quarter of 2007.    The Company announced that it would increase its third quarter 2007 provision for loan

losses by $11.1 million over the previous quarter's $4.2 million. Further, Amcore stated that it would take a $5.6 million impairment loss on the pending sale of $205 million in longer-term mortgage-backed bonds from its investment portfolio. The Company said that its non-performing loans were $41.2 million, an increase of $11.1 million from September 30, 2006, and $3.5 million from June 30, 2007.

91.     However, the Company failed to acknowledge any problems with its credit underwriting practices. Rather, Amcore blamed its increase in loan loss reserves entirely upon "the general softening of the economy and real estate conditions." Defendant Edge stated, "It is important to note that Amcore remains well-capitalized…"

92.     On November 26, 2007, Amcore Bank continued its expansion with the announcement of the opening of a new branch.

93.     During 2007, Amcore's stock lost approximately 30% of its value. The Company's problems would only get worse. In November 2007, Amcore announced the arrival of a new CFO—Defendant Sutfin.

94.     On January 22, 2008, Amcore reported its financial results for the fourth quarter of 2007. The Company reported that its net income from continuing operations for the full year 2007 decreased to $28.2 million from $47.0 million in 2006, including a $19.0 million increase in provision for loan losses compared to the previous year.

95.     The Company reported that the percentage of total non-performing assets to total assets was 1.45 percent at December 31, 2007, up from 0.64 percent at December 31, 2006 and 0.89 percent at September 30, 2007. Net charge-offs were $4.8 million, an increase of $2.0 million from fourth quarter 2006 and an increase of $265,000 from third quarter 2007. Full year

2007 diluted earnings per share from continuing operations was $1.23, which was a decrease from $1.91 in 2006.

96.     Again, rather than acknowledge problems with its lending practices, Amcore blamed its increase in loan loss reserves entirely upon "the general softening of the economy and real estate conditions."  The CEO again insisted that the Company was well-capitalized.

97.     On February 25, 2008, the Board announced that its CEO, Defendant Edge, would retire and be replaced by Defendant McManaman.

**B.     THE TRUTH BEGINS TO EMERGE**

98.     On March 17, 2008, Amcore filed its 2007 annual report on Form 10-K with the SEC.  The Company confirmed that loan loss reserves increased $19.0 million, or 187%, to $29.1 million in 2007 from $10.1 million in 2006, reflecting a 69% increase in net charge-offs and a 119% increase in non-performing loans.  Further, while Amcore's exposure to loan losses was increasing during 2007, the Company failed to adjust by decreasing its operating expenses.

99.     The Company also revealed that, during 2007, the OCC had examined Amcore Bank and found serious problems within its commercial lending division, including its credit underwriting practices.  Specifically, Amcore stated:

> On March 11, 2008, the OCC notified the Bank of its intent to enter into a written agreement to formalize the Bank's commitment to address weaknesses in the Bank's commercial lending area identified by the OCC in examinations during 2007. The terms of such agreement will likely include requirements for the Bank to improve credit underwriting and administration practices, among other things.

100.    The OCC found unsafe and unsound banking practices relating to asset quality and the overall administration of the credit function at Amcore Bank.

101.    Nonetheless, on March 19, 2008, Amcore Bank continued its expansion with the announcement of three new branches.

102.    On April 17, 2008, Amcore reported its financial results for the first quarter of

2008.  The Company reported a net loss for the first quarter 2008 of $27.5 million, a decrease

from net income of $8.2 million in the prior-year period and $7.5 million in the previous quarter.

Provision for loan losses was $57.2 million, a $54.1 million increase from the first quarter of

2007 and a $50.8 million increase from $6.4 million in fourth quarter 2007.

103.    The Company indicated that the poor results were caused by loan losses in the

commercial real estate division of Amcore Bank.  The Company claimed that it had begun a

process of evaluating its disciplines surrounding its lending practices and was beginning to make

improvements.   Amcore  also  stated  that  it  would  "establish  a  more  disciplined  execution

environment" and "respond to the recommendations of bank regulators."

104.    By May 2008, Amcore's stock price had plummeted 50% from the beginning of

the year.

105.    On May 8, 2008, Amcore announced that its dividend would be paid with a

combination of cash and stock because the Company needed to "proceed conservatively with

capital."

106.    On May 15, 2008, Amcore Bank entered into a written agreement with the

Comptroller of the Currency.  The Agreement required Amcore Bank to take specified measures

to address problems relating to asset quality, credit underwriting practices and the overall

administration of its credit function.

107.    Specifically, the OCC required Amcore Bank to obtain an external review of its

loan portfolios.  With respect to this, the Agreement required that:

> (1)    Within thirty (30) days, the Board shall engage an external
> and independent person(s) or firm, (the "External Reviewer") with
> qualifications to assess complex lending transactions, to conduct a
> thorough review of the bank's Real Estate (RE) and Commercial

and Industrial (CI) loans. At a minimum, the External Reviewer shall prepare a report ("the Report") setting forth its detailed findings and conclusions about the quality of these loans, the levels of classified and criticized assets, and the accuracy of internally assigned loan risk grades. The Report shall identify the loans reviewed and address any differences between the Bank's and the External Reviewer's risk ratings, and the Bank's compliance with legal and regulatory requirements and the Bank's loan policies.

(2)     Prior to engaging the External Reviewer, the Bank shall forward a draft copy of the proposed contract, including the proposed scope and any sampling methodologies to be used, and written qualifications of the individuals proposed to perform the review, to the Assistant Deputy Comptroller for written determination of no supervisory objection.

(3)     The Report shall be provided to the Board and management in writing with a copy forwarded to the Assistant Deputy Comptroller within one hundred twenty (120) days from the date of engagement of the External Reviewer.

108.    The OCC also required Amcore Bank to conduct an internal review of its loan portfolios:

(1)     Within ninety (90) days, the Board shall establish and implement an effective ongoing loan review system for the Bank's loan portfolios. The loan review system will be independent from the lending function, provide loan review personnel sufficient authority to perform their duties, and be staffed with sufficient and skilled personnel to ensure the timely and effective review of the Bank's loan portfolios.

(2)     The system shall provide for written reports to be filed with the Board at least quarterly. The first such report must be filed within 30 days of June 30, 2008. The system shall use a loan grading system consistent with the guidelines set forth in the Comptroller's Handbook – Rating Credit Risk and the Comptroller's Handbook – Allowance for Loans and Lease Losses. Such reports shall include, at a minimum, conclusions and support regarding:

(a)     compliance with the programs established by this agreement;

(b)     the identification, type, rating, and amount of problem loans;

23

(c)      the identification and amount of delinquent loans on nonaccrual status;

(d)      the level of credit and collateral documentation exceptions;

(e)      the identification and status of violations of laws, rules and regulations pertaining to the Bank's lending function;

(f)      the identification and analysis of concentrations of credit, significant economic factors, and general conditions and their impact on the credit quality of the Bank's loan portfolios;

(g)      the accuracy of the loan officer risk ratings including a listing of loans downgraded by internal or external loan review personnel; and

(h)      compliance with the Bank's lending policies detailing the number and volume of loans funded with exceptions or otherwise not in conformance with the Bank's lending policies.

(3)      Upon implementation, a written description of the system called for in this Article shall be forwarded to the Assistant Deputy Comptroller.

(4)      The Board or a committee designated by the Board shall evaluate the internal loan review report(s) and shall ensure that immediate, adequate, and continuing remedial action, if appropriate, is taken upon all findings noted in the report(s).

(5)      A copy of the reports submitted to the Board shall be forwarded to the Assistant Deputy Comptroller at the end of each quarter.

(6)      The Board shall ensure that the Bank has processes, personnel, and control systems to ensure implementation of and adherence to the system developed pursuant to this Article.

109.      The OCC found a significant portion of Amcore Bank's assets to be of questionable quality and required that:

(1)      The Bank shall continue to take action to protect its interest in those assets criticized in the December 31, 2007 Report of Examination, in any subsequent Report of Examination, by internal

24

or external loan review, or in any list provided to management by the National Bank Examiners during any examination.

(2)     Within ninety (90) days, the Board shall adopt and implement a written program designed to eliminate the basis of criticism of assets criticized in the ROE, in any subsequent Report of Examination, or by any internal or external loan review, or in any list provided to management by the National Bank Examiners during any examination as "doubtful," "substandard," or "special mention." This program shall include, at a minimum:

> (a)     an identification and timing of the expected sources of repayment;
>
> (b)     documentation of the current fair value of supporting collateral, and the position of the Bank's lien on such collateral where applicable;
>
> (c)     an analysis of current and satisfactory credit information, including cash flow analysis where loans are to be repaid from operations; and
>
> (d)     the proposed specific actions the bank is taking to eliminate the basis of criticism and the time frame for its accomplishment.

(3)     Upon adoption, a copy of the program for all criticized assets equal to or exceeding five hundred thousand dollars ($500,000) shall be forwarded to the Assistant Deputy Comptroller.

(4)     The Board or committee designated by the Board shall conduct a review, on at least a quarterly basis, to determine the status and effectiveness of the written programs

110.     Amcore Bank's loan portfolio management policy was also problematic.  Thus, the OCC required that:

(1)     Within ninety (90) days, the Board shall develop and implement a written program to improve the Bank's loan portfolio management and to implement the applicable specific actions outlined in the Matters Requiring Board Attention of the December 31, 2007 Report of Examination and any subsequent Report of Examination. Such program will include, among other things, procedures and systems that will (a) ensure compliance and conformance with the Bank's lending policies and laws, rules, and regulations pertaining to the Bank's lending function,

(a)    ensure the use of a performance appraisal process for lenders that, at a minimum, includes performance appraisals, job descriptions, and compensation/incentive programs which adequately considers performance relative to policy compliance, documentation standards, accuracy in credit grading, and other loan administration matters, and c) effectively stress test individual commercial real estate (CRE) loans and the CRE portfolio.

(2)    Upon adoption, the program shall be implemented and the Board shall thereafter ensure Bank adherence to the program. A copy of the program shall be forwarded to the Assistant Deputy Comptroller.

(3)    The Board shall ensure that the Bank has processes, personnel, and control systems to ensure implementation of and adherence to the program developed pursuant to this Article.

111.    The OCC found significant problems with Amcore Bank's lending policy and required the Bank to take the following actions:

(1)    Within ninety (90) days, the Board shall revise the Bank's written loan policy to implement the specific actions needed to improve the lending policy outlined in the Matters Requiring Board Attention of the December 31, 2007 Report of Examination and any subsequent Report of Examination. Those revisions shall address:

(a)    construction inspections and status reports;

(b)    loan covenants;

(c)    interest reserves; and

(d)    curtailment requirements for home construction loans

(2)    Within ninety (90) days, the Board shall revise its concentrations of credit policy to include, at a minimum, approved concentrations and limits for those concentrations.

(3)    Prior to adoption, the revised policies shall be forwarded to the Assistant Deputy Comptroller for review and written determination of no supervisory objection.

(4)      Upon receipt of the written determination of no supervisory objection, the policies shall be adopted and implemented and the Board shall thereafter ensure adherence to the policies.

(5)      The Board shall ensure that the Bank has processes, personnel, and control systems to ensure implementation of and adherence to the policies revised pursuant to this Article.

(6)      Within ninety (90) days, the Board shall establish MIS reports to implement the specific actions needed to improve the loan portfolio monitoring process outlined in the Matters Requiring Board Attention of the December 31, 2007 Report of Examination and any subsequent Report of Examination, and to ensure compliance with relevant regulatory guidance.

(7)      Copies of the reports developed under this Article shall be forwarded to the Assistant Deputy Comptroller upon completion.

(8)      The Board shall ensure that the Bank has processes, personnel, and control systems to ensure establishment of the MIS reports and improved monitoring processes developed pursuant to this Article.

112.    Additionally, Amcore Bank was required to monitor its loan portfolio:

(1)      Within ninety (90) days, the Board shall establish MIS reports to implement the specific actions needed to improve the loan portfolio monitoring process outlined in the Matters Requiring Board Attention of the December 31, 2007 Report of Examination and any subsequent Report of Examination, and to ensure compliance with relevant regulatory guidance.

(2)      Copies of the reports developed under this Article shall be forwarded to the Assistant Deputy Comptroller upon completion.

(3)      The Board shall ensure that the Bank has processes, personnel, and control systems to ensure establishment of the MIS reports and improved monitoring processes developed pursuant to this Article.

113.    The OCC required Amcore Bank to revise its real estate appraisal policy:

(1)      Within ninety (90) days, the Board shall revise the Bank's real estate appraisal policy and processes to implement relevant regulatory guidance and the specific actions needed to improve the appraisal function outlined in the Matters Requiring Board Attention of the December 31, 2007 Report of Examination and any subsequent Report of Examination.

(2)     Copies of the policy and process changes developed under this Article shall be forwarded to the Assistant Deputy Comptroller upon completion.

(3)     The Board shall ensure that the Bank has processes, personnel, and control systems to ensure implementation of, and adherence to, the policies and processes developed pursuant to this Article.

114.    Amcore Bank was required to correct each violation of law outlined in the Report of Examination dated December 31, 2007.

115.    The OCC found substantial problems with Amcore Bank's policy for assessing the adequacy of the allowance for loan and lease losses and required that:

(1)     Within sixty (60) days, the Board shall strengthen its methodology for assessing the adequacy of the Allowance for Loan and Lease Losses by adopting and implementing written policies and procedures for maintaining an adequate ALLL in accordance with generally accepted accounting principles. The ALLL policies and procedures shall be consistent with the guidance set forth in the Federal Financial Institutions Examination Council's "Interagency Policy Statement on the Allowance for Loan and Lease Losses" dated December 13, 2006 (OCC Bulletin 2006-47), and at a minimum shall include:

(a)     procedures detailing the process for identifying loans considered impaired how the amount of impairment for those loans will be measured, consistent with FASB Statement of Financial Accounting Standards Number 114, Accounting by Creditors for Impairment of a Loan;

(b)     procedures for segmenting the loan portfolio and estimating loss on groups of loans, consistent with FASB Statement of Financial Accounting Standards Number 5, Accounting for Contingencies; and

(c)     procedures for validating the ALLL methodology.

(2)     The revised policies and procedures shall address specific actions needed to improve the methodology outlined in the Matters Requiring Board Attention on page 7 of the December 31, 2007 Report of Examination and in any subsequent Report of Examination.

(3)     The revised policies and procedures shall provide for a review and approval of the Allowance by the Board at least once each calendar quarter. Any deficiency in the Allowance shall be remedied in the quarter it is discovered, prior to the filing of the Consolidated Reports of Condition and Income, by additional provisions from earnings. Written documentation shall be maintained indicating the factors considered and conclusions reached by the Board in determining the adequacy of the Allowance.

(4)     The Board shall ensure that the Bank has processes, personnel, and control systems to ensure implementation of and adherence to the policies and procedures developed pursuant to this Article.

116.    The Agreement resulted in Amcore Bank's ineligibility for certain actions and expedited approvals without the prior written consent and approval of the Comptroller.

117.    On July 17, 2008, Amcore reported its financial results for the second quarter of 2008. The Company reported a net loss of $20.2 million, compared to net income of $10.6 million in the prior-year period. Provision for loan losses was $40 million, a $35.8 million increase from the second quarter of 2007. However, Amcore continued to insist that it was a well-capitalized bank and had sufficient liquidity. The Chairman and CEO indicated that all was well, stating: "We are confident the actions we have taken to address our credit practices and efficiency issues will help strengthen our financial position."

118.    On the same day, the Company announced a new Chief Credit Officer.

119.    On August 11, 2008, Amcore filed its Form 10-Q with the SEC. Therein, the Company stated that it expected to comply with all of the requirements specified in the OCC agreement.

120.    On October 16, 2008, Amcore reported its financial results for the third quarter of 2008. The Company reported a net loss of $18.0 million for third quarter 2008, compared to net income of $1.9 million in the prior-year period. Provision for loan losses was $48.0 million, a

$32.7 million increase from the third quarter of 2007 and an $8.0 million increase from the second quarter of 2008. Net charge-offs were $26.8 million compared to $4.5 million in third quarter 2007, and $3.3 million in second quarter 2008. Non-performing loans were $191.4 million, compared to $41.2 million as of September 30, 2007 and $171.8 million at June 30, 2008.

121.    However, the Company continued to insist that all was well. For example, the Chairman and CEO, Defendant McManaman, stated:

> We are confronting these economic challenges by setting aside adequate reserves for potential loan losses and actively managing capital to enhance our stability. Moving forward, we are confident that the strategy we have in place will help us to navigate through today's economic headwinds, maintain high levels of customer satisfaction, and position Amcore for future success.

122.    On November 21, 2008, Amcore announced the suspension of its quarterly dividend. The Company had previously declared dividends every quarter since its formation in June 1983. In the press release, however, Amcore insisted that it remained well-capitalized.

123.    On November 24, 2008, Amcore Bank continued its expansion with the opening of a new branch in Vernon Hills.

124.    On January 22, 2009, Amcore reported its financial results for the fourth quarter of 2008. The results were far from good. The Company reported a net loss of $32.1 million for fourth quarter 2008, compared to net income of $7.5 million in the prior-year period and a net loss of $18.0 million in the previous quarter. Provision for loan losses was $57.5 million, a $51.1 million increase from the fourth quarter of 2007 and a $9.5 million increase from the third quarter of 2008. Net charge-offs were $55.9 million compared to $4.8 million in fourth quarter 2007, and $26.8 million in third quarter 2008. Non-performing loans were $313 million as of

December 31, 2008, compared to $71 million as of December 31, 2007 and $191 million as of September 30, 2008.

125.    On this news, the Company's stock fell 40%.

126.    On February 16, 2009, Amcore Bank continued its expansion with the announcement of two new branches.

127.    On March 6, 2009, the Company's definitive proxy statement revealed that the undercapitalized Amcore paid certain of its executives $1.2 million in bonuses.  Specifically:

> Under the bonus plan, CEO William McManaman received a $526,417 bonus in addition to his $484,500 salary. Chief Financial Officer Judith Carré Sutfin was given $190,625 plus her $305,000 salary, and Chief Operating Officer Donald Wilson received $250,833 plus his $350,000 salary. Executive vice presidents Richard Stiles and Guy Francesconi received bonuses of $132,916 and $125,666, respectively.
>
> Those five also are eligible for an additional $485,215, to be split among them, in retention bonuses this year, provided they remain with the company through Jan. 31, 2010.

Alex Gary, *Money-Losing Amcore Pays $1.2M in Bonuses*, Rockford Register Star (March 12, 2009).

128.    On March 16, 2009, in its Form 10-K report filed with the SEC, Amcore again touted its efforts to comply with all requirements specified in the OCC agreement.

129.    On April 27, 2009, Amcore reported its financial results for the first quarter of 2009.  The Company reported a net loss of $30.4 million for first quarter 2009, compared to a net loss of $27.5 million in the prior-year period.  Amcore also stated that its loan loss reserves were $62.7 million.

130.    On May 12, 2009, Amcore announced yet another new Chief Credit Officer.

131.    The next month, on June 26, 2009, Amcore announced that, as a result of ongoing discussions with regulators, it and Amcore Bank entered into agreements with regulators

designed to strengthen and improve the bank's financial condition and operations. Amcore entered into a Written Agreement with the Federal Reserve Bank of Chicago, while Amcore Bank agreed to the issuance of a Consent Order with the OCC.

132.    The OCC found Amcore Bank to be severely undercapitalized. The agreement with the Federal Reserve Bank of Chicago required that Amcore not incur, increase, or guarantee any debt, repurchase or redeem any shares of its stock, or pay any interest or principal on subordinated debt or trust preferred securities, in each case without the prior approval of the Federal Reserve Bank of Chicago.

133.    Further, the consent order required Amcore Bank to meet and maintain specified minimum capital levels and expressly stated that this meant that Amcore Bank could not be deemed to be "well capitalized" for purposes of 12 U.S.C. § 1831 o and 12 C.F.R. Part 6 pursuant to 12 C.F.R. § 6.4(b)(1)(iv). Specifically, Amcore Bank had to maintain the following minimum capital levels:

    (a)    Tier 1 capital at least equal to eight percent (8%) of adjusted total assets;

    (b)    Tier I risk-based capital at least equal to nine percent (9%) of risk-weighted assets; and

    (c)    Total risk-based capital at least equal to twelve percent (12%) of risk-weighted assets.

134.    The consent order also required Amcore Bank to develop, implement and adhere to a capital plan within 30 days of date of the order. Amcore Bank was to submit the capital plan to the Assistant Deputy Comptroller for review and approval immediately upon completion.

135.    The consent order also prohibited Amcore Bank from declaring any dividend without the prior written determination of no supervisory objection from the Assistant Deputy

Comptroller.  The order provided that, in the event that the OCC determined that Amcore Bank failed to meet the specified minimum capital levels, failed to submit an acceptable capital plan, or has failed to implement or adhere to the capital plan, then, within thirty 30 days of receiving written notice from the OCC, the Board must develop and submit to the OCC a disposition plan, detailing the Board's proposal to sell, merge or liquidate the Amcore Bank.

136.    On October 27, 2009, Amcore reported its financial results for the third quarter of 2009.  The Company reported a net loss of $156.4 million for third quarter 2009, compared to a net loss of $10.7 million in the previous quarter and a net loss of $18.0 million in the prior-year period, including a $60 million provision for loan losses.  Provision for loan losses was $60.3 million, a $43.3 million increase from $17 million in second quarter 2009 and a $12.3 million, or 26 percent, increase from $48 million in third quarter 2008.  Non-performing loans, net of charge-offs and settlements, were $431 million at September 30, 2009, compared to $416 million at June 30, 2009 and $191 million at September 30, 2008.

137.    The Company also stated that it was "undercapitalized or significantly undercapitalized under some regulatory capital standards at the consolidated and bank levels."

## C.    THE COMPANY'S CONDITION CONTINUES TO DETERIORATE—AND ITS STOCK PRICE PLUMMETS

138.    On November 9, 2009, Amcore filed its Form 10-Q report with the SEC.  Therein, the Company announced that, by letter dated November 4, 2009, the OCC notified Amcore Bank of its finding that the Company's proposed capital restoration plan was unacceptable because it was not likely to succeed.  The OCC further advised Amcore Bank that it was being treated as "significantly undercapitalized."  The OCC gave the Company until December 4, 2009 to submit a new plan.  The Federal Reserve Bank of Chicago also rejected the Company's capital

restoration plan. Additionally, Amcore Bank had failed to meet the minimum capital requirements set forth in the consent order.

139. On December 4, 2009, Amcore submitted its new proposed capital restoration plan to the OCC.

140. On December 14, 2009, Amcore announced that it completed a $135 million loan sale.

141. On January 13, 2010, Amcore announced that the OCC rejected its plan to raise capital, on the basis that the capital restoration plan was not based on "realistic assumptions." The OCC also opined that Amcore's planned asset sales were unwise because they "have increased the overall risk to the bank's capital base.

142. On March 12, 2010, Amcore announced that it received a notice from The Nasdaq Stock Market (NASDAQ) stating that because the minimum bid price of the Company's common stock was below $1.00 per share for 30 consecutive business days, the Company was therefore not in compliance with Nasdaq Marketplace Rule 5450(a)(1). This meant that if Amcore did not regain compliance with the bid price rule by June 7, 2010, NASDAQ would notify the Company that its common stock is subject to delisting.

143. On March 22, 2010, Amcore filed its 2009 Form 10-K annual report with the SEC. Therein, the Company stated that it had failed to comply with the requirements of the consent order with the OCC. Specifically, the Company stated:

> In consultation with its professional advisors, and in compliance with the Consent Order, the Bank developed and timely submitted the Capital Plan and liquidity risk management program to the OCC, and the Company developed and timely submitted the capital plan to the FRB [Federal Reserve Bank of Chicago] as required under the FRB Agreement.
>
> By letter dated November 4, 2009 (the "Letter"), the OCC notified the Bank of its finding that the Capital Plan was "not acceptable",

stating that the OCC was unable to determine that the Capital Plan "is likely to succeed in restoring the Bank's capital at this time." The OCC further advised the Bank that it was being treated as "significantly undercapitalized" within the meaning of the prompt corrective action (the "PCA") provisions of the Federal Deposit Insurance Act and implementing OCC regulations. As a result of this regulatory determination, the Bank thereupon became subject to the PCA activity and operational restrictions applicable to "significantly undercapitalized" depository institutions, including, among other things, the mandatory requirement that the Bank submit an acceptable Capital Restoration Plan ("CRP"), as required under the PCA guidelines, no later than December 4, 2009. The Letter also indicated that the OCC was requiring the Bank to prepare and submit to the OCC a plan for the sale or merger of the Bank (a "Disposition Plan") by December 4, 2009, as specified under the Consent Order.

On November 6, 2009, the FRB notified the Company in writing that the Company's capital plan submitted under the terms of the FRB Agreement was unacceptable in addressing the capital erosion of the Company and the Bank. The FRB concluded that, based on the information provided by the Company, as well as the Company's current negative financial trends, the Company's capital plan was not viable.

Further, the Bank was unable to meet the regulatory capital maintenance requirements of the Consent Order by the required September 30, 2009 date. As a result of the OCC Agreement, as well as the FRB Agreement, the Consent Order and the Letter, the Company was ineligible for certain actions and expedited approvals without the prior written consent and approval of the applicable regulatory agency. These actions include, among other things, the appointment of directors and senior executives, making or agreeing to make certain payments to executives or directors, business combinations and branching.

In consultation with its professional advisors, the Bank resubmitted a combined CRP and Disposition Plan by the required December 4, 2009 due date. By return letter dated January 8, 2010 (the "Response Letter"), the OCC notified the Bank that its CRP was not acceptable. According to the OCC, the CRP was not accepted because, among other things, it did not meet the statutory requirements that the CRP be based on "realistic assumptions" and be likely to succeed in restoring the Bank's capital. In addition, on January 12, 2010, the FRB notified the Company that the Company's capital plan previously submitted to the FRB continued to be unacceptable in addressing the capital erosion of the

35

> Company and the Bank. The Response Letter provided that even if the Bank's capital ratios improve to the undercapitalized category, the Bank would continue to be subject to operational restrictions applicable to significantly undercapitalized institutions until such time as the Bank has submitted to the OCC an acceptable CRP. The OCC also stated its view that the recently announced asset sales by the Bank have increased the overall risk to the Bank's capital base.

144.    On or about March 29, 2010, despite the OCC's admonition Amcore Bank completed the sale of 14 locations to Midland States Bank, including $495 million in deposits and sweep accounts, $430 million in loans and $400 million in trust and brokerage account relationships.

145.    On April 23, 2010, Amcore Bank was shut down by the OCC and the FDIC was named as receiver.

146.    On the same day, NASDAQ halted trading of Amcore stock at a final price of 79 cents per share.

147.    As described further herein, Defendants, as fiduciaries of the Plan, were obligated to continuously ensure that the Plan's investment alternatives—including Amcore common stock—were prudent investments for the Plan's assets.  However, Defendants failed to do so—to the substantial detriment of the Plan and its participants.

148.    Since the beginning of the Class Period through the present, the Plan's imprudent investments in Amcore common stock have been decimated, as indicated below:



*Source:* http:www.bigcharts.com.

**D.    DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT AMCORE STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLAN, YET FAILED TO PROTECT PLAN PARTICIPANTS**

149.    During the Class Period, although they knew or should have known that the Company's stock was an imprudent Plan investment, Defendants did nothing to protect the heavy investment of Plan participants' retirement savings in Amcore stock.

150.    As a result of the enormous erosion of the value of Company stock, the Plan's participants, the retirement savings of whom was heavily invested in Amcore stock, suffered unnecessary and unacceptable losses.

151.    Because of their high ranking positions within the Company and/or their status as Plan fiduciaries, Defendants knew or should have known of the existence of the above-mentioned problems.

152.    Defendants knew or should have known that, due to the Company's exposure to losses stemming from the problems described above, the Company stock price would suffer and

devastate participants' retirement savings once the truth became known. Yet, Defendants failed to protect the Plan and its participants from foreseeable losses.

153. Rather, during the Class Period, despite its obligation to prudently manage the Plan's assets—including the Plan's heavy investment in Amcore stock—the Company and the CEO misrepresented the Company's true financial condition, thereby precluding Plan participants from properly assessing the prudence of investing in Company stock.

154. As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plan's participants regarding the Plan's investment in Amcore stock did not effectively inform the Plan's participants of the past, immediate, and future dangers of investing in Company stock.

155. In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA. Defendants also failed to conduct an appropriate investigation into whether Amcore stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's participants with information regarding Amcore's problems so that participants—to the extent that they were permitted—could make informed decisions regarding whether to include Amcore stock in their Plan accounts.

156. An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Amcore stock was clearly imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

157. Because Defendants knew or should have known that Amcore was not a prudent investment option for the Plan, they had an obligation to protect the Plan and their participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Amcore stock.

158. Defendants had available to them several different options for satisfying this duty, including, among other things: making appropriate public disclosures as necessary; divesting the Plan of Amcore stock; discontinuing further contributions to and/or investment in Amcore stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by Amcore they could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of Amcore stock.

159. Despite the availability of these and other options, Defendants failed to take adequate action to protect participants from losses resulting from the Plan's investment in Amcore stock. In fact, Defendants continued to invest and to allow investment of the Plan's assets in Company stock even as Amcore's problems came to light.

## E. AT LEAST CERTAIN OF THE DEFENDANTS SUFFERED FROM CONFLICTS OF INTEREST

160. Amcore's SEC filings, including Form DEF 14A Proxy Statements, during the Class Period make clear that a portion of certain officers' compensation was in the form of stock awards and option awards. *See* Amcore Definitive Proxy Statement, filed with the SEC on March 22, 2010, at 19.

161. Because the compensation of at least some of the Defendants was significantly tied to the price of Amcore stock, at least certain of the Defendants had incentive to keep the

Plan's assets heavily invested in Amcore stock on a regular, ongoing basis. Elimination of Company stock as an investment option/vehicle for the Plan would have reduced the overall market demand for Amcore stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of Amcore stock, resulting in reduced compensation for at least certain of the Defendants.

162.    Some Defendants may have had no choice in tying their compensation to Amcore stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plan participants' and beneficiaries' retirement savings tied up to a large extent in Amcore stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

163.    These conflicts of interest put certain of Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan participants and beneficiaries, whose interests Defendants were obligated to loyally serve with an "eye single" to the Plan.  *See generally Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251-52, 124 L. Ed. 2d 161, 113 S. Ct. 2063 (1993); *Hahnemann Univ. Hosp. v. All Shore, Inc.,* 514 F.3d 300, 309 (3d Cir. 2008); 29 U.S.C. § 1104(a)(1)(B).

## CLAIMS FOR RELIEF UNDER ERISA

164.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

165.    ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

166.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be

personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

167. ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

168. These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982). They entail, among other things:

(a) The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

(b) A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

(c) A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey

complete and accurate information material to the circumstances of

participants and beneficiaries.

169.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary,"

provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be
> liable for a breach of fiduciary responsibility of another fiduciary
> with respect to the same plan in the following circumstances: (A) if
> he participates knowingly in, or knowingly undertakes to conceal,
> an act or omission of such other fiduciary, knowing such act or
> omission is a breach; (B) if, by his failure to comply with section
> 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his
> specific responsibilities which give rise to his status as a fiduciary,
> he has enabled such other fiduciary to commit a breach; or (C) if
> he has knowledge of a breach by such other fiduciary, unless he
> makes reasonable efforts under the circumstances to remedy the
> breach.

170.    Plaintiffs therefore bring this action under the authority of ERISA §502(a) for

Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the

breaches of fiduciary duties by Defendants for violations under ERISA §404(a)(1) and ERISA

§405(a).

## COUNT I

**FAILURE TO PRUDENTLY AND LOYALLY MANAGE THE PLAN'S ASSETS**
**(BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §404 AND §405 BY**
**ALL DEFENDANTS)**

171.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

172.    At all relevant times, as alleged above, all Defendants were fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary

authority or control over the administration and/or management of the Plan or disposition of the

Plan's assets.

173.   Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in the Company's stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

174.   A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

175.   Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding Plan investments/investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.

176. Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period these Defendants knew or should have known that, as described herein, the Amcore common stock was not a suitable and appropriate investment for the Plan. Investment in Company stock during the Class Period clearly did not serve the Plan's stated purpose. Yet, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

177. Defendants further breached their duties of loyalty and prudence by failing to divest the Plan of Amcore stock when they knew or should have known that it was not a suitable and appropriate Plan investment.

178. Defendants further breached their duties of loyalty and prudence by failing to ensure that participants liquidated their investments in Amcore stock and transferred the sale proceeds to the investment options available in the Plan. With actual or constructive knowledge that Plan participants did not have full and complete information about the Company's problems, and thus were unable to make fully informed decisions about whether to retain their holdings in Company stock, Defendants had the fiduciary obligation to either inform Plan participants of the need to take action to protect their financial interests or, if necessary, to liquidate the Plan's holdings of Company stock on participants' behalf to ensure that they did not suffer a financial loss.

179. Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition and the Company's concealment of the same and, generally, by conveying inaccurate information

44

regarding the Company's future outlook.  During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, and/or allowed participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock.  As such, participants in the Plan could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

180.    Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company stock.  Defendants had or should have had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy them.

181.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.  Had Defendants taken appropriate steps to comply with their fiduciary obligations, participants could have liquidated some or all of their holdings in Company stock and thereby eliminated, or at least reduced, losses to the Plan.

182.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### BREACH OF DUTY TO AVOID CONFLICTS OF INTEREST
### (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404 AND 405 BY ALL DEFENDANTS)

183.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

184.    At all relevant times, as alleged above, Defendants were fiduciaries within the Plan within meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

185.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on Plan fiduciaries a duty of loyalty, that is, a duty to discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

186.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities; and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities.

187.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

188.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

**FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES AND PROVIDE THEM WITH ACCURATE INFORMATION (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 BY AMCORE AND THE DIRECTOR DEFENDANTS)**

189.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

190.     At all relevant times, as alleged above, Amcore and the Director Defendants were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

191.     At all relevant times, as alleged above, the scope of the fiduciary responsibility of Amcore and the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the Compensation Committee and the Company officers, employees and agents to whom fiduciary responsibilities were delegated.

192.     The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. In this case, that means that the monitoring fiduciaries, Amcore and the Director Defendants, had the duty to:

      (a)    Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

      (b)    Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(c)  Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(d)  Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(e)  Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investments; and

(f)  Ensure that the monitored fiduciaries report regularly to the monitoring fiduciaries. The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

193.  Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a Plan's assets, and must take prompt and effective action to protect a Plan and its participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a Plan and a Plan's assets.

194.  Amcore and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to

inevitable and significant depreciation.  Amcore and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) continuing to invest the assets of the Plan in Amcore common stock when it no longer was prudent to do so; and (ii) imprudently allowing the Plan to continue offering Amcore stock as an investment alternative.  Despite this knowledge, Amcore and the Director Defendants failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

195.    In addition, Amcore and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Amcore that they knew or should have known that these Defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

196.    Amcore and the Director Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

197.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

198.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## CAUSATION

199.    The Plan suffered millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in Company stock during the Class Period, in breach of Defendants' fiduciary duties, as  reflected in the diminished account balances of the Plan's participants.

200.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and its participants would have avoided a substantial portion of the losses that they suffered through the Plan's continued investment in Company stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

201.    As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

202.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

203.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

204. Plaintiffs, the Plan, and the Class are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

205. Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A. A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B. A Declaration that the Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.      An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of Amcore maintained by the Plan in proportion to the accounts' losses attributable to the decline in Amcore's stock price;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.      An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

DATED:  May 24, 2010                    Respectfully submitted,

                                        s/Norman Rifkind
                                        Norman Rifkind
                                        **LASKY & RIFKIND, LTD.**
                                        Leigh R. Lasky
                                        Norman Rifkind
                                        Amelia S. Newton
                                        Heidi VonderHeide
                                        350 N. LaSalle Street
                                        Suite 1320
                                        Chicago, IL 60610
                                        (312) 634-0057

                                        *Local Counsel for Plaintiffs*

                                        **BARROWAY TOPAZ KESSLER
                                        MELTZER & CHECK, LLP**
                                        Joseph H. Meltzer
                                        Edward W. Ciolko

Joseph A. Weeden
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiffs and the Proposed Class*